| | |
|---|---|
| AARON BORLAND,<br><br>       Plaintiff,<br><br>   v.<br><br>CITY OF CARTHAGE, MISSOURI,<br>ABIGAEL ALMANDINGER, MICHAEL<br>MILLER, GREG DAGNAN, NATE DALLY,<br>TRACI COX, DAN RIFE, and KEENAN &<br>BHATIA, LLC,<br><br>       Defendants. | Case No. 3:26-cv-05062<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

For his Complaint, Plaintiff Aaron Borland states, alleges and avers to the Court as follows:

1. This Complaint asserts claims pursuant to 42 U.S.C. §1983 and supplemental state law claims.

2. Plaintiff Aaron Borland is and was at all relevant times a resident of Carthage, Jasper County, Missouri.

## DEFENDANTS

3. Defendant City of Carthage, Missouri ("Defendant City" or simply "City") is a municipal corporation located in Jasper County, Missouri. As of the last U.S. Census, it has just under 16,000 residents.

4. Defendant Abigael Almandinger ("Defendant Almandinger" or simply "Almandinger") is resident of Jasper County, Missouri. She was the City's Director of Parks and Recreation from December 28, 2022, until June 24, 2025. She is being sued in her official and

individual capacities. She is also being sued as a private citizen for tortious acts she committed after her employment with City was terminated.

5. Defendant Michael Miller ("Defendant Miller" or simply "Miller) is a resident of Jasper County, Missouri. He has been serving as the City's Human Resources Coordinator since June, 2023 and upon information and belief currently holds this position. He is being sued in his official and individual capacities.

6. Defendant Greg Dagnan ("Defendant Dagnan" or simply "Dagnan") is a resident of Jasper County, Missouri. From approximately 2007 through January 2022, he was the City's Police Chief. In July 2021, he began transitioning to the City's Assistant City Administrator (while still serving as Police Chief) and officially began serving in this position in January 2022. From April 1, 2022, until May 31, 2024, he served as City Administrator. He is being sued in his official and individual capacities.

7. Defendant Nate Dally ("Defendant Dally" or simply "Dally") is a resident of Jasper County, Missouri. He served as City Attorney from approximately 2006 through May 10, 2024. He is being sued in his official and individual capacities.

8. Defendant Traci Cox ("Defendant Cox or simply "Cox") is a resident of Jasper County, Missouri. From December 2015 through sometime approximately in 2023 she served as City Clerk. In approximately 2024, she served as Assistant City Administrator and Interim City Administrator until March 2025. Since then, she has served as City Administrator. She is being sued in her official and individual capacities.

9. Defendant Dan Rife ("Defendant Rife" or simply "Rife") is a resident of Jasper County, Missouri. He served as City Mayor from April 2019 through April 2025. He is being sued in his official and individual capacities.

2

10.     Defendant Keenan & Bhatia, LLC ("Defendant Law Firm") is a Missouri limited liability company formed for the purpose practicing law. Its principal place of business is in Kansas City, Missouri.

11.     This is a civil action seeking jurors' assessment of damages against Defendants City, Almandinger, Miller, Dagnan, Dally, Cox, and/or Rife, individually or collectively, for committing acts under the color of law that deprived Plaintiff Borland of his free speech, liberty and property rights secured under the United States Constitution, as well as the jurors' assessments of damages against the Defendant Almandinger as a private citizen, and her attorneys' Defendant Keenan & Bhatia.

## JURISDICTION AND VENUE

12.     This Court has federal question jurisdiction pursuant to 28 U.S.C. §§1331 and 1342, over the Plaintiff's 42 U.S.C. §1983 claims against the Defendant City and its named current and past employees. Specifically, this Court has jurisdiction over these claims because they arise under the United States Constitution and have been brought in this Court pursuant to 42 U.S.C. §1983 (hereinafter "§1983").

13.     This Court has supplemental jurisdiction over the related state law claims against Defendant Almandinger, individually, and Defendant Keenan & Bhatia pursuant to 28 U.S.C. §1367(a) because the alleged claims arising under Missouri law are related and form part of the same case or controversy arising under Plaintiff's §1983 claims.

14.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(b) because the acts and omissions giving rise to Plaintiff's claims occurred in this District. Specifically, Plaintiff's causes of action arose and accrued in Jasper County, Missouri.

3

## FACTS COMMON TO ALL COUNTS

15. At issue in this case are Plaintiff Borland's rights under the First, Fourteenth (Section 1) and Fifth Amendments to the U.S. Constitution and their equivalent under Article I § 10 of the Missouri Constitution.

16. The pertinent part of the First Amendment of the U.S. Constitution provides: "…no law shall abridge the freedom of speech…".

17. The pertinent part of the Fourteenth Amendment (Section 1) of the U.S. Constitution provides: "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law;…".

18. The pertinent part of the Fifth Amendment of the U.S. Constitution provides: "…nor be deprived of life, liberty, or property, without due process of law;…".

19. Article I § 10 of the Missouri Constitution reiterates these rights and states: "That no person shall be deprived of life, liberty or property without due process of law."

20. On or about March 25, 2019, Plaintiff Borland was hired as Defendant City's Municipal Golf Maintenance Supervisor.

21. In January, 2021, Plaintiff Borland was promoted by Defendant City to Golf Superintendent.

22. Not until his promotion did Plaintiff Borland assume the duty and responsibility for purchasing chemicals used at the Carthage Municipal Golf Course ("the Golf Course").

23. Unbeknownst to Plaintiff Borland, on or about December 20, 2022, (with a report date of December 27, 2022), a complaint was initiated with the City of Carthage Police Department accusing Plaintiff Borland of stealing over $25,000 and "Acceding to Corruption."

4

Upon information and belief, this accusation was initiated by Defendant Greg Dagnan, who was at that time serving as City Administrator for Defendant City. These accusations were always false.

24. Plaintiff Borland did not learn most of the information set forth below until he finally obtained copies of the Carthage Police Department's "investigation" reports until on or about January 13, 2026. Plaintiff Borland had sought this information numerous times over a 3-year period from various City officials but was denied access as referenced below.

25. On December 27, 2022, Carthage City Police Department Detective (hereinafter "Detective I") I met with Plaintiff Borland and questioned him about fuel and chemicals used at the Golf Course. Records indicate that this interview was audio recorded and saved as digital evidence.

26. On December 28, 2022, Defendant Almandinger was hired as the Parks Director by the Defendant City. Upon information and belief, Almandinger had no experience or background in serving as a Parks Director.

27. Upon information and belief, Defendant Dagnan was the primary driving force behind Defendant Almandinger being hired as Parks Director. Prior to this, Defendants Dagnan and Almandinger had become close friends.

28. On or about December 29, 2022, Defendant Almandinger alleged to Detective I that she was told by a chemical vendor's sales person that another chemical company "had offered [Plaintiff] Borland a $1,900.00 kickback" and Borland told them "we don't do that anymore."

29. The only conversation between Plaintiff Borland and the chemical sales representative was that the Golf Course no longer participated in "rebates" from the chemical

5

suppliers. Plaintiff Borland specifically stated that the Golf Course had changed its method handling rebates, in that rebates were formerly provided in checks payable to the City. After becoming Superintendent, Plaintiff Borland had the chemical vendors switch from providing rebate checks made payable to the City to simply providing the City with credit on its accounts with the chemical vendors in the amount of each vendor's rebate.

30.     Plaintiff Borland made this change purely to make the rebate process more transparent and easier from the City's accounting standpoint.

31.     In a supplementary report dated January 4, 2023, Detective I notes on December 29, 2022, he told the chemical vendor's sales representative what Defendant Almandinger had claimed. The chemical vendor's sales representative specifically told Detective I that there was nothing criminal about the chemical vendor's rebate programs and the rebates were an industry standard. The sales representative then stated he had nothing more to say in the matter.

32.     A Carthage Police Department report prepared by another Detective (hereinafter "Detective II") in a supplemental report dated January 24, 2023, notes that on January 5, 2023, he and Detective I met with Dagnan in his City Administrator's office. Detective II "asked [Defendant] Dagnan if he had any suspicions of thefts due to a large amount of fuel missing." Detective II notes: [Defendant] "***Dagnan was adamant that something was going to come up missing.***" When the Detective asked Dagnan how he came to that conclusion, Dagnan asserted: "***Mark Peterson and [Plaintiff] Borland would be stealing money together if anything.***" Dagnan also falsely claimed that Plaintiff Borland had been spoken to "several times about [City] policy violations for purchases that had been made."

33.     Defendant Dagnan never spoke to Plaintiff Borland about any alleged "policy violations" and Plaintiff Borland never received any verbal or written warnings about any alleged

6

"policy violations." It should be noted that three years later, when Plaintiff Borland reviewed his City employee file with Defendant Miller, no such disciplinary actions were noted in Borland's City personnel file.

34. In the same report, three hours later, Detective II writes that he and Detective I spoke to Defendant Almandinger, in her office seeking information "due to concerns about a possible theft." Almandinger then claimed she received a phone call from the same chemical vendor salesperson referenced above. Among other things, all Almandinger recalled was the salesperson allegedly told her about a random envelope that contained $1,900 cash but admitted she could not "recall when or who was in the same room as the [alleged] envelope…".

35. On or about January 11, 2023, (with a report date of January 25, 2023), Detective II interviewed the then City's Director of Parks and Recreation Mark Peterson ("Peterson"). Peterson explained to Detective II that the checks from chemical vendors were made payable to the City of Carthage and constituted rebates. Peterson then explained that Plaintiff Borland began ordering from a different chemical vendor and shortly thereafter another rebate check arrived. Plaintiff Borland specifically left the check on Peterson's desk and asked what he was supposed to do with it. In the same conversation, Detective II notes that he explained to Peterson the entire matter appeared to be more of an issue of sloppy recording keeping by two employees other than Peterson and Plaintiff Borland.

36. Plaintiff Borland did not feel comfortable handling checks because he did not have check cashing authority. He only received two rebates checks during his time as superintendent and turned both over to Peterson before Peterson was forced to resign when threatened and pressured by Defendant Dagnan.

7

37.     As to the rebate checks, Plaintiff Borland improved the process by specifically having chemical vendors issue credit to the City's account for the rebates versus issuing a check so that Borland did not have to deal with checks.

38.     A report by Detective II, dated January 12, 2023, (with a report date of January 25, 2023), indicated Borland's receipt of the prior checks was ***not*** in violation of City code or policies in the employee handbook.

39.     Detective II then notes false information in the report. Specifically, he claims that Plaintiff Borland said he received an "unknown amount of cash in his office." Borland never made such a statement. Further, the report claims that Borland said he received a check for $448 and that he used it to purchase a new golf mat. Instead, Plaintiff Borland told Detective II that a credit had been issued to the City's account by a chemical vendor, furthermore Plaintiff Borland could not cash the check because he did not have check cashing authority. After he was terminated without cause and was provided no post-termination due process to clear his name, Plaintiff Borland was able to obtain a copy of the chemical vendor's records showing the $448 was credited to the City. Plaintiff Borland used this record later, in a separate unemployment benefits hearing, with the Missouri Division of Unemployment Security.[1]

40.     In a later portion of Detective II's report, dated January 12, 2023, (with a report date of January 25, 2023), Detective II writes that he spoke with Defendant Dagnan and Defendant Dally "separately." Defendant Dagnan is specifically noted as the person who brought up that City policy ***does allow all department heads and City employees to accept checks.*** Detective II also notes that he received a copy of the policy and "attached it to crime scene

---

[1] This is specifically addressed in paragraphs 71 and 74-78 of this Complaint.

8

folder." Detective II also specifically notes: "***Dagnan advised that the checks were kickback checks, and not rebate checks regardless of what Peterson and Borland called them***."

41. Defendant Dagnan's statement was false and there was no evidence to support such a claim. It is particularly disturbing given that Defendant Dagnan was, at the time, City Administrator having transitioned from Carthage Police Chief, and having been Detective II's boss.

42. Defendant Dagnan leveled these false allegations against Borland (and Peterson) with malice and in bad faith to cost Borland his job and to harm his good reputation in the Carthage (and wider) community.

43. Although Detective II's report indicates he spoke with Defendant Dally about this issue, he does not record any comments made by Defendant Dally. Upon information and belief, Defendant Dally let Defendant Dagnan's false allegations against Borland stand without objection.

44. The day after, on January 13, 2023, between 2:00 and 4:00 pm, Defendant Almandinger (who had just been made the City's Parks and Recreation Director on or about December 28, 2022), met with Plaintiff Borland to discuss an alleged "a lack of transparency and truthfulness."

45. Defendant Almandinger began questioning Plaintiff Borland, asking him where "all the contracts were for the "free" rounds of golf."[2] Plaintiff Borland then asked Defendant Almandinger if she had a contract to store Christmas ornaments related to Defendant Almandinger's work with "Vision Carthage", a non-City, not-for-profit organization, for which Almandinger was a board member prior to being appointed Parks Director. Plaintiff Borland

---

[2] This is specifically addressed in paragraphs 67-69 of this Complaint.

9

questioned how storing her Vision Carthage ornaments in his work area for the Golf Course was advantageous to the City. Shortly prior to this meeting, Almandinger had given her keys to others so that they could access a Golf Course building to store Almandinger's ornaments. This building was where the Golf Course stored its fuel. Specifically, it should be noted that under City Code Section 604.02.1 "Standard of Conduct", it states that "Unlawful or Illegal Conduct" includes: "unauthorized use or the use of City property in a manner or for a purpose for which the property was not designed or intended." When Plaintiff Borland raised this issue, Defendant Almandinger got upset and cried.

46. In retaliation for Borland exercising his First Amendment free speech right by raising Defendant Almandinger's potential misuse of City property, on or about January 17, 2023, Plaintiff Borland was summoned to a meeting with Defendant Almandinger and Defendant Miller in Almandinger's office. In the meeting, Almandinger and Miller told Borland he was being placed on paid administrative leave and that they would contact him once they had finished their investigation.

47. Not only did Almandinger's and Miller's actions violate Borland's First Amendment rights, they likewise violated the City's Code, Section 604.02.10 under "Standard of Conduct", "Unlawful or Illegal Conduct", which provides: "Any act or conduct which violates established duties or rights of employees or the public, including but not limited to rights of privacy, sexual harassment, racial prejudice, defamation and physical safety."

48. No right is more clearly established than freedom of speech. It is also clearly established that the City may not discharge on a basis that infringes on an employee's constitutionally protected interest in freedom of speech.

49.     That same day, Defendant Almandinger handed Plaintiff Borland a written letter indicating he was a suspect in a criminal investigation for "kickbacks" and he was being placed on paid administrative leave effective January 18, 2023, while the Carthage Police Department completed their investigation. The letter indicated further disciplinary action may occur as a result of the investigation. Plaintiff Borland was instructed not to have any contact with anyone at the City during his administrative leave. Borland was instructed by Almandinger to sign the letter, which he did. A true and correct copy of the letter is attached as Exhibit A and incorporated herein by reference.

50.     There was *NO EVIDENCE* obtained by the Carthage Police Department that indicated that Plaintiff Borland ever received any "kickbacks". The only thing prompting the "investigation" up to this point were the false accusations by Defendant Dagnan, City Administrator and former Carthage Police Chief, who precipitated and drove the "investigation." Upon information and belief, Defendant Dagnan was also simultaneously exercising his influence over Defendant Almandinger, prompting her and others' unlawful actions toward Plaintiff Borland.

51.     Upon information and belief, Plaintiff Borland's exercise of Free Speech under the First Amendment by questioning Defendant Almandinger's improper use of City property was a substantial or motivating factor in the City employees named herein taking adverse employment action against Plaintiff Borland. This, combined with the defamatory statements and lack of due process referenced throughout this Complaint, resulted in Plaintiff Borland's damages as further alleged in this Complaint.

52.     On January 26, 2023, Detective II notes that he tried to contact Plaintiff Borland by phone and left a voicemail. Detective II notes that he contacted a couple of chemical vendors.

11

One vendor indicated that rebate checks come from manufacturers and that such checks would be made payable to the City. This relates to, and is supported by the same documentation Plaintiff Borland obtained to support his appeal for unemployment benefits denial after he was forced to resign without a hearing and due process referred to in paragraphs 57-59 below.

53. On January 26, 2023, at 3:30 p.m., Defendant Almandinger contacted Plaintiff Borland by phone and told him that he needed to contact Detective II the next morning at 8:30 a.m. Plaintiff Borland replied that this would be a violation of his administrative leave conditions and his rights under the Fifth Amendment of the U.S. Constitution, since he had been identified as a suspect in a criminal case. At 5:27 p.m., Plaintiff Borland received a text message from Defendant Almandinger instructing him that "[he] still need to contact Detective [II] tomorrow at 8:30 a.m."

54. The next day, January 27, 2023, Plaintiff Borland contacted Detective II. Plaintiff Borland then explained he had been put on administrative leave and was instructed not to contact anyone with the City, which is why he had not initially returned Detective II's phone call. Detective II then told Borland that he [Detective II] was not going to speak with Borland about anything that had to do with administrative discipline. Detective II then began to question Borland. Plaintiff Borland replied that he had retained legal counsel and had been instructed to say nothing further about his job in the City. Detective II concluded by saying that he was not going to speak to him involving anything in the City, just "my current investigation."

55. Upon information and belief, the information in paragraph 54 above is the last Carthage Police Department report entry that makes any reference to Borland.

56. Four days later, on January 31, 2023, Defendant Almandinger contacted Plaintiff Borland along with Defendant Miller on speaker phone. Defendant Almandinger informed

12

Plaintiff Borland that he needed to come to her office and sign personnel documentation for violating City policy that would result in his termination or he could resign.

57. At 2:00 p.m. that day, Plaintiff Borland met with Defendants Almandinger and Miller. They handed Borland a Notice of Disciplinary Action memo, attached hereto as Exhibit B and incorporated herein by reference. The memo specifically refers to City Policy Manual 604.01.4: "Misuse of any office or employment position for the purposes beyond the reasonable scope of duties of that office or position or for any personal gain directly related to the employment by the City" and 604.01.5: "Acceptance of gifts, personal services, or other remuneration of value, other than ordinary compensation, benefits and awards approved or sanctioned by the policies of the City Council or by a recognized professional or occupational group or organization for the performance of job duties". The memo sets forth no facts regarding how Plaintiff Borland allegedly violated these City Policy Manual provisions.

58. Neither Defendants Almandinger, Miller, Dagnan, Rife, Dally nor Cox ever provided Plaintiff Borland with an actual "Appendix D Notice of Disciplinary Action" form and/or "Appendix E Notice of Hearing" form as required by the City's Personnel Policy Manual, Section 700.12 under "Employee Relations", depriving Plaintiff Borland of his substantive due process rights under the U.S. Constitution. Blank forms of the Notice of Disciplinary Action and Notice of Hearing are attached as Exhibits C and D, respectively and incorporated herein by reference.

59. Instead of letting the "investigation" proceed and instead of providing Plaintiff Borland with any pre-termination or post-termination due process rights in the manner prescribed by the City's Personnel Policy Manual so that he could defend himself against the false accusations, Defendants Almandinger and Miller forced Plaintiff Borland to resign. Specifically,

13

Defendants Almandinger and Miller only gave Plaintiff Borland two options: 1) Sign the Notice of Disciplinary memo, admitting that he was guilty of the City's false accusation; or 2) Resign in lieu of termination and the City would not put the false accusation in his personnel file.

60. Plaintiff Borland vehemently denied the false accusation that he received "kickbacks" from City vendors.

61. Defendants Dagnan, Dally, Cox and/or Rife knew that Plaintiff Borland was being stripped of his rights to due process and they, along with Almandinger and Miller, acted with malice or in bad faith for the improper purpose of taking away Plaintiff Borland's job and harming his reputation in the Carthage (and wider) community.

62. Upon information and belief, Defendant Dally, in his official and individual capacity as City Attorney, specifically instructed Defendants Almandinger and Miller how to handle Plaintiff Borland's termination. Defendant Dally did nothing to ensure that Plaintiff Borland was afforded his substantive and procedural due process rights.

63. Given the Hobbesian choice presented to him as referenced above, and the fact that he was afforded no due process, Plaintiff Borland provided the City on or about January 31, 2023, with his handwritten forced resignation (constructive discharge), a copy of which is attached hereto as Exhibit E and incorporated herein by reference. Nowhere did Plaintiff Borland expressly waive his pre-termination or post-termination rights to due process.

64. By failing to provide Plaintiff Borland with any name-clearing due process during his termination Defendants Almandinger, Miller, Dagnan, Dally, Cox, and Rife acting under of color of state law, deprived Plaintiff Borland of his rights and liberty interest in his reputation under the Fourteenth Amendment (Section 1) of the U.S. Constitution. Even though Plaintiff Borland was an at-will employee with the City, he still had the right to hold his continued

14

employment free from unreasonable governmental interference, bringing his claim within the "liberty" and "property" rights under the Fifth Amendment of the U.S. Constitution.

65. When state actors in their official and individual capacities deprive a person of a significant right or status conferred by state law based upon their public determination that the person was guilty of dishonesty, immorality, criminality, and the like, that person, such as Plaintiff Borland here, is entitled to procedural due process.

66. Plaintiff Borland's claims for his reputational damages combined with his due process claims under §1983 are subject to Missouri's personal injury five-year statute of limitations under §516.140(2) RSMo. *See, **Owens v. Okure**, 488 U.S. 235, 240 (1989).

67. Prior to Plaintiff Borland's tenure with the City, since 1997, the City had a policy or custom of not charging greens fees to Golf Course Superintendent Association of America ("GCSAA") members and Professional Golfers' Association ("PGA") members when they played the City's Golf Course.

68. Because Plaintiff Borland is a member of the GCSAA, he was not charged greens fees to play on the City's Golf Course.

69. However, on or about February 4, 2023, Plaintiff Borland, accompanied by Danny Curry ("Curry") (who did not work for the City), went to the City's Golf Course Pro Shop. Plaintiff Borland wanted to schedule a tee time the next day and spoke to the City's Associate Head Golf Professional Tyler Markham ("Markham"). Markham confirmed the tee time and told Borland how much it was going to cost. Markham said he would take care of the other GCSAA members, but Borland would have to pay. When Borland questioned why he had to pay, Markham responded, in front of Curry, "Abi [Almandinger] instructed me due to kickbacks and

15

the ongoing investigation. You and Mark will have to pay; every other GCSAA & PGA member will be handled the same as it always had been."

70.     Defendant Almandinger knew or should have known that her false accusations told to Markham would be repeated to, or in the presence of, third-parties like Curry. These false accusations repeated to, or in the hearing of third-parties outside of the City's internal structure, constitutes publication of Almandinger's defamatory statement about Borland.

71.     Plaintiff Borland then filed a claim for unemployment benefits with the Missouri Department of Labor and Industrial Relations ("the State"). On or about March 31, 2023, Plaintiff Borland's claim for unemployment benefits with the State was denied due to false claims by the City. The denial specifically states as its reason: "The claimant was discharged because he was taking kickbacks from vendors. This was a violation of the employer's policy #604 standards of conduct." This official statement by the City was false and defamatory and was nearly identical to the one  Markham repeated in his meeting with Plaintiff Borland and Curry. Both instances were made in connection with the City terminating Plaintiff Borland's employment.

72.     By Defendants Almandinger and Miller (and possibly others) falsely accusing Borland of a crime and transmitting it to third-parties outside the City, as well as the City, Almandinger, Dagnan, Dally, Cox and Rife denying Plaintiff Borland any due process in connection with his termination, Borland has a "stigma plus" claim under §1983.

73.     Defendant City is liable for Plaintiff Borland's constitutional violations under §1983 because it had official policies or a widespread custom of depriving persons like Plaintiff Borland of their due process and other rights granted under the U.S. Constitution and elsewhere. On or about May 14, 2025, it was reported that the City's insurance carrier warned that the City's

16

rates would be raised or coverage dropped altogether due to risky employment practices of elected officials. Specifically, the City's insurance carrier stated that terminations by the City were not following employment law.

74. On or about April 23, 2023, Plaintiff Borland appealed the State's decision to disqualify him from unemployment benefits. A true and correct copy of Plaintiff Borland's appeal and supporting evidence is attached as Exhibit F and incorporated herein by reference.

75. On or about May 15, 2023, Plaintiff Borland's appeal of the States' decision was heard by a State referee. She heard under oath testimony from Defendants Almandinger and Miller, who claimed that Plaintiff Borland resigned in lieu of termination. Miller further stated that Plaintiff Borland was a suspect for taking kickbacks and that he [Defendant Miller] consulted with the City's attorney, Defendant Dally, on how to proceed. Miller claimed that Defendant Dally said to terminate Plaintiff Borland or that Borland could resign. Defendant Miller also noted that Plaintiff Borland had never received any prior warnings for his behavior or misconduct. The State Referee also heard under oath testimony from Plaintiff Borland.

76. After hearing the evidence, the State referee found: "The claimant has not been charged with a crime by the police. There is no substantial evidence indicating that the claimant engaged in willful misconduct as he was never warned about any substantial policy violation prior to his discharge". Further, "…the discharge of the claimant [Plaintiff Borland] on January 31, 2023, was not for good cause as claimant's actions did not constitute willful misconduct." A true and correct copy of the "Decision of Appeals Tribunal" is attached hereto as Exhibit G and incorporated herein by reference.

77. The State referee's "Decision" was: "The deputy's determination is reversed. The claimant [Borland] is not disqualified for benefits by reason of the claimant's discharge from work on January 31, 2023." (Exhibit G).

78. The City never appealed the Appeals Tribunal's decision. Plaintiff Borland was afforded no similar due process hearing by the City to clear his name.

79. During this same general timeframe, Plaintiff Borland contacted Defendant Miller, Defendant Cox and Chad Dininger, the Captain and Assistant Chief of the City Police Department ("Dininger"), to see if he could find out what was going on with "the investigation" and to obtain access to his City personnel file. Plaintiff Borland was denied access each time by the above individuals, each claiming that the matter was still under investigation as the basis for each denial.

80. On or about September 10, 2024, Plaintiff Borland requested a City Council member to email Defendant Cox to request Plaintiff Borland's City personnel file. Later that evening Defendant Cox again denied the request, citing an ongoing investigation. This was approximately 588 days after Plaintiff Borland's constructive discharge by the City.

81. On or about May 12, 2025, Plaintiff Borland again met with Defendant Cox, who was now the City Administrator to find out if she had any updates on the ongoing "investigation". She said she had talked to the Police Department and couldn't find anything "ongoing" with respect to Plaintiff Borland. She then instructed Plaintiff Borland to contact Defendant Miller to review his City personnel file. Plaintiff Borland emailed Defendant Miller to schedule an appointment the next day to review his City personnel file.

82. On or about May 13, 2025, Plaintiff Borland met with Defendant Miller to review his City personnel file. After his review, Defendant Miller asked" "Is everything in there that you

18

thought?". Plaintiff Borland replied: No, I don't see the Tribunal Decision where I won my unemployment case. Wouldn't that make me rehireable?". Defendant Miller stated: "I don't see why not. I'll look into it."

83. Shortly thereafter, Plaintiff Borland went to the Police station. He spoke to Dininger again to seek investigation materials. He told Plaintiff Borland that the investigation was still "ongoing" as it was linked to Peterson and none of the information would be public until they went to trial." It should be noted that the "case" against Peterson was dismissed 3 years later because there was no evidence that Peterson committed any crime.

84. Approximately 20 minutes later after leaving the Police station, Defendant Miller called Plaintiff Borland. Defendant Miller now claimed that Plaintiff Borland had broken another City policy because he did not give enough notice when he resigned in lieu of being terminated. Defendant Miller's statement was non-sensical: How could Borland have provided adequate notice when he was constructively discharged by the forced resignation and was told it was effective immediately?

85. On or about October 10, 2025, Plaintiff Borland hand delivered his resume to Mayor Bren Flanigan and Defendant Miller at City Hall. Plaintiff Borland applied for his prior position with the City because he had learned that his successor had accepted a position at a private golf course. Plaintiff Borland also left his resume with the Operations Supervisor at the City Golf Course, since Richard Bonine ("Bonine") was out of the office. Bonine had recently replaced Defendant Almandinger as the Parks and Recreation Director, after she was terminated by the City on or about June 24, 2025.

86. On or about November 8, 2025, Plaintiff Borland met with Bonine to follow up after submission of his resume. Bonine told Plaintiff Borland that he [Bonine] had received an

19

email stating Plaintiff Borland was not eligible for rehire because he took "kickbacks." When Plaintiff Borland asked if Bonine had the email, Bonine's demeanor changed and he stalled Plaintiff Borland by never answering Borland's question.

87. On or about November 17, 2025, Plaintiff Borland met with Defendant Cox to determine why he was not eligible for rehire. Defendant Cox stated that Defendant Miller had sent an email to Plaintiff Borland explaining why. When Borland indicated he had never received such an email, Defendant Cox said she would forward it to Borland.

88. On or about November 18, 2025, Defendant Cox forwarded the email that Defendant Miller allegedly sent on May 14, 2025, to Borland. The email states: "after looking into your question of whether you are rehireable or not, I found since you resigned in lieu of termination, you are not considered rehireable." Defendant Miller's email claimed that Borland violated City policy by not giving adequate notice. Specifically, "Employees who are not given the option to fulfill a 2-week notice are considered non-rehireable as well."

89. On or about December 23, 2025, Defendant Almandinger filed a lawsuit against the City claiming she had been wrongfully discharge for a multitude of reasons. It was filed in Jasper County Circuit Court, Case No. 25AP-CC00032 (hereinafter "Almandinger's lawsuit"), a copy of which is attached hereto as Exhibit H and incorporated herein by reference.

90. Almandinger's lawsuit states, in part, the following:

   a. "Ms. Almandinger replaced Mark Peterson as the Director of Parks and Recreation". (Exhibit H, ¶ 12);

   b. "Around January 2023, Greg Dagnan, the City Administrator at the time, discovered accounting irregularities related to Mr. Peterson's operation of the

City of Carthage's Parks Department. Mr. Dagnan reported his findings to the City Council and law enforcement." (Exhibit H, ¶13);

c. "Upon starting her position, Ms. Almandinger immediately discovered extensive corruption throughout the Parks Department, including kickbacks, impropriety, and systemic policy violations that her predecessor left behind." (Exhibit H, ¶ 15);

d. "Ms. Almandinger took decisive action to address these problems. She placed Golf Superintendent Aaron Borland on administrative leave after police confirmed he admitted to taking vendor kickbacks." (Exhibit H, ¶ 16).

91.     By claiming that Plaintiff Borland admitted to taking vendor kickbacks, Defendant Almandinger defamed and libeled Plaintiff Borland because she knew her statement was false; entertained serious doubts as to its truth; relied upon inherently unreliable sources; ignored obvious contradictory evidence; fabricated "facts" and/or acted with reckless disregard for the whether her statement was true or false, any of which singularly or in combination show her actual malice, evidence of bad faith or recklessness.

92.     Defendant Almandinger's statements, particularly by naming Plaintiff Borland and accusing him of serious crimes, were not pertinent to her claim for wrongful termination and far exceeded what was necessary to state her cause of action for wrongful termination. As a result, neither she nor the defendant law firm (named below) can rely on any alleged privilege applicable to judicial proceedings.

93.     Specifically, Plaintiff Borland was a complete stranger to Defendant Almandinger's lawsuit for her alleged wrongful termination against the City. Identifying him by name served no litigation purpose; the defamatory statement served no litigation purpose; his

21

name and the defamatory statement were unnecessary to any of Almandinger's claims; the defamatory statement and Borland's name were solely inserted to disparage Borland; and it bore no legitimate relation to the issues before the court in Almandinger's lawsuit.

94. Almandinger's lawsuit was filed by Defendant Keenan & Bhatia. As Almandinger's attorneys, Defendant Keenan & Bhatia, were at all relevant times acting as Defendant Almandinger's agents and acting within the course and scope of said agency. (Exhibit E, p. 16).

95. As a result, Defendant Almandinger is vicariously liable for all of Defendant Keenan & Bhatia's tortious acts or omissions as described herein.

96. As her agents, Defendant Keenan & Bhatia, knew or should have known that expressly naming Plaintiff Borland and falsely claiming he admitted to a crime was defamatory and libeled Plaintiff Borland. In addition, they knew that more likely than not, these statements they set forth in Almandinger's lawsuit would further stigmatize Plaintiff Borland's standing, reputation, good name, honor and integrity in the community.

97. Defendant Keenan & Bhatia also represented Defendant Dagnan in the lawsuit he filed for wrongful termination against the City of Carthage (and others) on or about May 15, 2024, in Jasper County Circuit Court, Case No. 24AO-CC00165 ("the Dagnan lawsuit"). A true and correct copy is attached as Exhibit I and incorporated herein by reference.

98. Interestingly, unlike in Almandinger's lawsuit, in Dagnan's lawsuit, Defendant Keenan & Bhatia *redacted* the names of those Dagnan accused of crimes concealing those individuals' names from public view. These names were redacted from Dagnan's original Petition as well as his subsequent First and Second Amended Petitions. True and correct copies of Dagnan's Original, First, and Second Amended Petitions are attached as Exhibits I, J, and K,

respectively and incorporated herein by reference. (Exhibit I, ¶¶ 22, 25-26; 28-29; and 44); (Exhibit J, ¶¶ 22, 25-26; 28-29; and 44); and (Exhibit K, ¶¶ 18-19; 21-22; and 38).

99. By claiming that Plaintiff Borland admitted to taking vendor kickbacks, Defendant Keenan & Bhatia defamed and libeled Plaintiff Borland because they knew their statement was false; entertained serious doubts as to its truth; relied upon inherently unreliable sources; ignored obvious contradictory evidence; fabricated "facts" and/or acted with reckless disregard for the whether their statement was true or false, any of which singularly or in combination show their actual malice, evidence of bad faith or recklessness.

100. Defendants Almandinger and Keenan & Bhatia could have easily redacted Plaintiff Borland's name and/or not directly accused him of admitting to a crime. The publication of Plaintiff Borland's name was no more relevant to Almandinger's lawsuit than the redacted names of others accused of crimes were in Dagnan's lawsuit.

101. On or about December 24, 2025, Plaintiff Borland and his family began receiving phone calls alerting him and his family about statements being reported by news media outlets based on Almandinger's lawsuit as described above. As stated above, Almandinger's lawsuit contains false and impertinent statements about Borland.

102. Within a day of the filing of Almandinger's lawsuit, on or about December 24, 2025, The Turner Report, a Joplin, Missouri blog, reported verbatim Defendant Almandinger's false and defamatory statements from her Petition to the public at large. A true and correct copy of The Turner Report from that day is attached as Exhibit L and incorporated herein by reference.

103. On or about December 24, 2025, KOAM News (a Joplin television station) posted a full copy of Almandinger's lawsuit on its website for public consummation. A true and correct copy of KOAM News publication is attached as Exhibit M and incorporated herein by reference.

104.     On or about December 24, 2025, KSN 16 News (a Joplin television station) posted its story on its website about Almandinger's lawsuit for public consummation. It republished Defendant Almandinger's statements from paragraphs 15-16 of her lawsuit and added: "He no longer works for the City." A true and correct copy of KSN 16 News publication is attached as Exhibit N and incorporated herein by reference.

## COUNT I – SECTION 1983 CLAIMS AGAINST DEFENDANTS CITY, ALMANDINGER, MILLER, DAGNAN, DALLY, COX AND RIFE

105.     Plaintiff Borland incorporates by reference all paragraphs above as though fully set forth herein.

106.     As a direct and proximate result of depriving Plaintiff Borland of his rights to liberty, property, and due process, Defendants City, Almandinger, Miller, Dagnan, Dally, Cox and Rife in their official and individual capacities are liable under §1983 for all his damages which were caused or contributed to be caused by their actions or omissions, individually or in concert.

107.     As a direct and proximate result of the actions or omissions of these Defendants, as alleged above, Plaintiff Borland has suffered and continues to suffer harm to his reputation, embarrassment, humiliation and emotional distress as well as loss of nearly $200,000 in back pay to date, loss of his health insurance, the Missouri Local Government Employees Retirement System ("LAGERS") pension and other benefits.

108.     Under 42 U.S.C. §1988, a prevailing party under §1983 is entitled to recover attorneys' fees and costs, as well as other damages.

109.     Excluding the City, the acts or omissions of one or more of the named Defendants in this Count constitute willful, wanton, reckless, or show conscious disregard and deliberate indifference to Plaintiff Borland's rights, thereby entitling him to an additional assessment of

punitive damages against each of the individual Defendants named in this Count, in an amount sufficient to punish each one and to deter others from like conduct.

WHEREFORE, Plaintiff Borland prays for judgment on this Count against one or more of the Defendants named in this Count for his damages, for his attorneys' fees and costs, for an additional assessment of punitive damages and for any other relief to which he may be entitled.

### COUNT II – SECTION 1983 CONSPIRACY CLAIM AGAINST DEFENDANTS ALMANDINGER, MILLER, DAGNAN, DALLY, COX AND RIFE

110. Plaintiff Borland incorporates by reference all paragraphs above as though fully set forth herein.

111. Based on the predicate tort and constitutional violations set forth above, two or more of the Defendants named in Count I conspired to violate Plaintiff Borland's liberty, property, and due process rights by agreement as evidenced by a meeting of the minds between two or more of the Defendants.

112. The aforesaid acts or omissions committed by one or more of the conspirators were done with the object of depriving Plaintiff Borland of his rights and privileges under law.

113. The Defendants' acts or omissions set forth above caused or contributed to cause Plaintiff Borland to suffer the damages set forth in paragraph 107 above.

114. Based on the foregoing, Plaintiff Borland is likewise entitled to his attorneys' fees and costs, as well as an assessment of punitive damages as set forth in paragraphs 108-109 above.

WHEREFORE, Plaintiff Borland prays for judgment on this Count against one or more of the Defendants referenced in this Count for his damages, for his attorneys' fees and costs, for an additional assessment of punitive damages and for any other relief to which he may be entitled.

25

## COUNT III – TORTIOUS INTERFERENCE WITH A BUSINESS EXPECTANCY AGAINST DEFENDANTS ALMANDINGER, MILLER, DAGNAN, DALLY, RIFE AND COX

115. Plaintiff Borland incorporates by reference all paragraphs above as though fully set forth herein.

116. Plaintiff Borland had a valid business expectancy in his job with the City and the Defendants named in this Count were all aware of his relationship with the City.

117. One or all the Defendants named in this Count caused or contributed to cause breach or intentional interference of the constitutional duties owed to Plaintiff Borland as referenced above, including but not limited to his due process rights.

118. One or all the Defendants lacked justification for the breach or intentional interference as alleged.

119. As a direct and proximate result, one or all the Defendants named in this Count caused or contributed to cause Plaintiff Borland to suffer the damages set forth in paragraph 107 above.

120. Based on the foregoing, Plaintiff Borland is entitled to his attorneys' fees and costs, as well as an additional assessment of punitive damages as set forth in paragraphs 108-109 above.

WHEREFORE, Plaintiff Borland prays for judgment on this Count against one or more of the Defendants referenced in this Count for his damages, for his attorneys' fees and costs, for an additional assessment of punitive damages and for any other relief to which he may be entitled.

26

<u>**COUNT IV – DEFAMATION AGAINST DEFENDANT ALMANDINGER, AS A PRIVATE CITIZEN AND DEFENDANT KEENAN & BHATIA**</u>

121. Plaintiff Borland incorporates by reference all paragraphs above as though fully set forth herein.

122. On or about December 23, 2025, Defendant Almandinger, acting as a private citizen, and her attorneys, Defendant Keenan & Bhatia, republished the false and defamatory statements about Plaintiff Borland with the requisite degree of fault, (either maliciously, in bad faith, recklessly or negligently) expressly naming him as having committed a crime as set forth above.

123. By including Plaintiff Borland's name and the false statements about him in Almandinger's lawsuit, Defendants Almandinger and Keenan and Bhatia knew, or should have known that the information in Almandinger's lawsuit would be republished by the news media and others to the public at large.

124. Defendants Almandinger and Keenan & Bhatia were at fault in publishing the statements in Almandinger's lawsuit about Plaintiff Borland as referenced above and knew said statements were false and impertinent or alternatively, published said statements with reckless disregard for whether said statements were true or false at a time when the Defendants had serious doubts as to whether they were true or false.

125. Defendants Almandinger and Keenan & Bhatia knew or should have known that said statements would subject Plaintiff Borland to ridicule and deprive him of the benefit of public confidence and social associations.

126. Said statements were read by the public when they were republished by the aforementioned news media.

127. As a direct and proximate result of the actions and omissions of Defendants Almandinger and Keenan & Bhatia, Plaintiff Borland's reputation was damaged.

128. The acts or omissions of Defendants Almandinger and Keenen & Bhatia in this Count are willful, wanton, reckless or show conscious disregard or deliberate indifference to Plaintiff Borland's rights, thereby entitling him to an additional assessment of punitive damages against each Defendant named in this Count in an amount sufficient to punish each one and to deter others from like conduct.

WHEREFORE, Plaintiff Borland prays for judgment on this Count against Defendants Almandinger and Keenan & Bhatia for his damages, his costs incurred, for an additional assessment of punitive damages and for any other relief to which he may be entitled.

**ALESHIRE ROBB, P.C.**

By */s/Gregory W. Aleshire*
Gregory W. Aleshire    MO #38691
William R. Robb        MO #43322
2847 Ingram Mill Road, A-102
Springfield, MO 65804
417.869.3737 PHONE
417.869.5678 FAX
*info@aleshirerobb.com*
**ATTORNEYS FOR PLAINTIFF**

28